**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **PERCILLA JOHNSON,** | * | |
| | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil Case No. 19-cv-1859** |
| | * | |
| **XACIER BECERRA** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Percilla Johnson claims that her employer, the United States Department of Health and Human Services ("HHS"), and its agency, the Food and Drug Administration ("FDA" or "the Agency"), are liable pursuant to Title VII of the Civil Rights Act of 1964 for a hostile work environment based on sexual harassment.  This Court held a bench trial from June 21 until June 24, 2022.

This Court has heard and considered all the evidence, both testimonial and documentary. For the following reasons, Plaintiff has not met the requisite burden of proof to prevail on her claims.  Accordingly, this Court finds in favor of Defendant.

## I.    FINDINGS OF FACT

This Court finds the facts stated herein based on its evaluation of the evidence, including the credibility of the witnesses,[1] and the inferences that the Court has found reasonable to draw from the evidence:

1.  Johnson has been employed by the FDA in its Rockville, Maryland office from 2010 to present.  In October, 2016, Johnson was a Program Specialist in the FDA Office of Regulatory Affairs, where she planned and coordinated travel arrangements and trips. Johnson Testimony, June 21, 2022.

2.  Kimberly Mbodj became Johnson's first-line supervisor in 2015.  Before becoming her supervisor, Mbodj was Johnson's coworker and acquaintance.  Mbodj's supervisor— and, in turn, Johnson's second-line supervisor—is Yvette Arline.  *Id.*; *see also* Def's Trial Ex. 7 (Organizational Charts).

3.  Heriberto Negron-Rivera was employed by the FDA as a Consumer Safety Officer in its Rockville, Maryland office from 2008 until 2018.  In 2016, Yvette Arline was Negron-Rivera's first-line supervisor.  *Id.*; *see also* Arline Testimony, June 22, 2022. Michael Chasey became Negron-Rivera's first-line supervisor in May, 2017, following an internal reorganization.  Chasey Testimony, June 23, 2022.

4.  Although Negron-Rivera and Johnson were both located in the Rockville, Maryland office, the two were on separate teams and did not work together directly.  Negron-Rivera did not have supervisory authority over Johnson.  Def's Trial Ex. 7 (Organizational Charts); Arline Testimony, June 22, 2022.  Prior to October, 2016, the

---

[1] The credibility determinations that informed this Court's findings of fact are described in detail in Sec. II, *infra*.

two were congenial professional acquaintances and did not associate socially.  Johnson Testimony, June 21, 2022.

**A.  October 13, 2016 Incident**

5.  On Thursday, October 13, 2016, Johnson and Negron-Rivera left the office to go to lunch together at a nearby buffet restaurant.  Negron-Rivera drove, and Johnson accompanied him in the passenger-side of the vehicle.  *Id.*

6.  As Negron-Rivera approached the restaurant and parked the car, he tried to kiss, or did kiss, Johnson on the mouth.  Johnson told Negron-Rivera to stop, and he did so. Negron-Rivera apologized to Johnson.  The two exited the vehicle and proceeded into the restaurant.  *See* Johnson Testimony, June 21, 2022; *see also* Mbodj Testimony, June 23, 2022.

7.  Negron-Rivera and Johnson had lunch together without incident.  During lunch, the two discussed an upcoming trip that Johnson was coordinating.  After lunch, Johnson and Negron-Rivera reentered Negron-Rivera's vehicle to return to work.  Johnson Testimony, June 21, 2022.

8.  On the ride back to the office, Negron-Rivera initiated lewd conversation with Johnson, including by offering to take her to a hotel, which Johnson declined.  Negron-Rivera drove back to the office, and they both returned to work.  *Id.*; *see also* Mbodj Testimony, June 23, 2022.

**B.  Week of October 16, 2016**

9.  On October 18, 2016, Negron-Rivera emailed Johnson and asked if she was in the office; Johnson responded that she was not, but that she would be in the office the next day.  Def's Trial Ex. 5 (Emails between Johnson and Negron-Rivera, Oct. 18, 2016). Shortly thereafter, Johnson emailed Negron-Rivera, and asked him to get her two large

paper calendars that were being distributed in the office. *Id.*; *see also* Johnson Testimony, June 21, 2022. Negron-Rivera responded that he had already set two aside for her, and Johnson agreed to pick them up from his office. Johnson Testimony, June 21, 2022.

10. Roughly an hour later, at 1:14 p.m., Negron-Rivera emailed Johnson's personal email address, stating, "[j]ust to confirm that we have communication thru your personal email. Please confirm that you received this message to proceed with tge [*sic*] pics." Def's Trial Ex. 6 (Email from Negron-Rivera to Johnson, Oct. 18, 2016).

11. On either October 18, or October 19, 2016, Johnson asked Mbodj if they could have an "off the record" conversation. Johnson informed Mbodj that she had gone to lunch with Negron-Rivera. Johnson told Mbodj that Negron-Rivera had "tried to kiss her" when their heads met while buckling their seatbelts. Johnson did not say that Negron-Rivera had groped her or attempted to grab her breasts. Johnson also did not mention that she had coordinated with Negron-Rivera to pick up calendars from his office. Mbodj Testimony, June 23, 2022; *see also* Johnson Testimony, June 21, 2022.

12. During their conversation on October 18 or October 19, Mbodj asked if Johnson wanted to file a complaint. Johnson stated that she did not, but that she just wanted to make Mbodj aware of the situation. During the conversation, Johnson's demeanor seemed typically calm; she did not appear visibly shaken or upset. Mbodj advised Johnson to email Negron-Rivera to make it clear that she just wanted to be friends, but otherwise

took no action in response to her conversation with Johnson.[2]  *See* Mbodj Testimony, June 23, 2022.

13. On October 19, 2016, Johnson went to Negron-Rivera's office to retrieve her calendars. When she arrived, Negron-Rivera closed the door, and hugged and kissed her.  Johnson told him to stop, and at some point thereafter, left his office.  Johnson Testimony, June 21, 2022.

14. After leaving his office, Johnson sent Negron-Rivera an email at 10:58 a.m. that stated "Hello: Thank you for the calendars.  I will appreciate that we remain co-worker [*sic*] and nothing else."  Negron-Rivera responded, "OK Amiga."  Pl's Trial Ex. 1 (Emails between Johnson and Negron-Rivera, Oct. 19, 2016).

## C. Week of October 23, 2016

15. On October 26, 2016, Johnson attended a staff meeting at which Negron-Rivera and a mutual colleague, Aver Bennett-Lamb, were also present.  Johnson felt that Negron-Rivera was staring, or looking at her inappropriately, during the meeting.  Johnson Testimony, June 21, 2022.

16. Later that day, Johnson attended a retirement party for a coworker.  Afterwards, Johnson went to Bennett-Lamb's office to give her cookies from the party.  When she

---

[2] Mbodj denied telling Johnson to send an email to Negron-Rivera during their initial conversation on October 18 or October 19, and testified that she instead gave this advice on October 27, 2016. *See* Mbodj Testimony, June 23, 2022.  This Court deems Mbodj's testimony to be otherwise entirely credible, but believes her to be confused as to the timing that she delivered this particular advice.  The Court reached this determination due to the email sent from Johnson to Negron-Rivera on October 19, in which Johnson asked if they could be just coworkers, combined with Johnson's testimony that the email was sent on advice from Mbodj.  *See* Pl's Trial Ex. 1 (Emails between Johnson and Negron-Rivera, Oct. 19, 2016); Johnson Testimony, June 21, 2022.  Logically, then, Mbodj must have advised Johnson to send the email during their initial meeting.  It does not follow, however, that the initial meeting had to have been on October 19, because it is possible that Johnson did not instantly comply with Mbodj's advice once given.

arrived, she was startled to find that Negron-Rivera was also in Bennett-Lamb's office.

Negron-Rivera did not make any comment to Johnson, nor did he touch or attempt to

touch her.  At some point thereafter, Johnson left Bennett-Lamb's office.  *Id*.

17. After working hours on October 26, 2016, Johnson called her second-line supervisor,

Yvette Arline, and left the following voicemail message:

> Hey Yvette, this is Percilla [Johnson].  I need to talk to you about something
> and I – I mean, I was – I tried to call Kim [Mbodj] but her phone is off and
> I've already mentioned it to her once before, but I'm starting to feel really
> really uncomfortable about the situation, even worse than it already has, so
> if you'd be so kind please give me a call so that I can talk to you and I'm
> hoping that we can talk, like, off the record, and you can kind of like give
> me some guidance on where I should go with this, because I don't know
> what to do.  So give me a call.  301-730-0028.  Thank you.

Johnson's tone of voice throughout the message was measured, calm, and unperturbed.

She did not sound audibly frightened, upset, or otherwise emotional.  Def's Trial Ex.

22 (Voicemail from Johnson to Arline, Oct. 26, 2016).

18. Arline listened to Johnson's voicemail on the evening of October 26, 2016, but felt that

it was not urgent, and resolved to return Johnson's call the following day.  Arline

Testimony, June 22, 2022.

19. In the morning on October 27, 2016, Johnson and Mbodj spoke by phone.  Johnson

stated that she would like to file a complaint against Negron-Rivera because in addition

to the lunch incident she had previously disclosed to Mbodj, he had kissed her when

she went to retrieve calendars from her office, and had stared at her during a staff

meeting.  Mbodj told Johnson that she would reach out to her supervisor, Arline, to

determine next steps.  Mbodj Testimony, June 23, 2022.

20. At 8:23 a.m. on October 27, 2016, Johnson sent Arline a text message, which stated:

> Good morning Yvette: I left you a message yesterday.  You can disregard I got in touch with Kim [Mbodj].  I was really scared yesterday didn't know what to do.  Never been sexual harassed before.  I want to speak with you about the recurring situation and I am afraid to tell Jay.  But nevertheless Kim is going to help me.

Def's Trial Ex. 1 (Text messages between Johnson and Arline, Oct. 27, 2016).  Arline responded by text message at 9:02 a.m., stating "Good morning Percilla.  If you still need to talk I'm available.  This isn't something you should have to deal with and I'm here if you need me.  If this is happening at work we need to report it . . .".  *Id.*

21. Arline and Johnson subsequently spoke by phone.  Johnson informed Arline that Negron-Rivera had kissed her when they were buckling their seat belts on their way to lunch, and that he had kissed her a second time when she retrieved some calendars from his office.  Arline told Johnson that she would provide her with information regarding the process to file a formal complaint.  Arline Testimony, June 22, 2022.

22. After the conversation, Arline contacted her deputy director, Ann Marie Montemurro, to discuss the issue and ask for informational materials regarding reporting sexual harassment.  Montemurro emailed a sexual harassment informational pamphlet to Arline, who in turn provided it to Mbodj with instructions to give it to Johnson.  *Id.*; *see also* Def's Trial Ex. 11 (Email from Arline to Mbodj, Oct. 27, 2016).  When Mbodj sent Johnson the sexual harassment pamphlet, her email crossed paths with an email from Johnson to Mbodj, sending the same informational pamphlet.  Mbodj Testimony, June 23, 2022.

23. Arline next contacted Roderick Brown, the employee labor relations liaison for management within FDA headquarters.  In consultation with Brown, Arline decided to speak to Negron-Rivera in-person on Tuesday, November 1, 2016, the next date that

both she and Negron-Rivera would be together in the office.  Arline Testimony, June 22, 2022.

24. On October 28, 2016, Johnson sought and obtained a temporary peace order against Negron-Rivera in Montgomery County, Maryland, District Court.  Pl's Trial Ex. 3 (Peace Order, Nov. 4, 2016).  The Peace Order stipulated that a hearing on a final peace order would be held on November 4, 2016 ("Peace Order Hearing").  *Id.*

**D.  Week of October 30, 2016**

25. On October 31, 2016, Arline sent Negron-Rivera an invitation to attend an in-person meeting the following day, November 1, 2016.  Arline Testimony, June 22, 2022.

26. On November 1, 2016, Arline met with Negron-Rivera and a union representative, who attended via telephone at Negron-Rivera's request.  Arline informed Negron-Rivera of the allegations against him and directed him to immediately cease and desist all contact with Johnson and Bennett-Lamb.  Arline specified that any work-related matters concerning Johnson or Bennett-Lamb should instead be channeled through their respective supervisors.  Arline provided Negron-Rivera with information on preventing harassment, and a copy of the FDA's policy on harassment and discrimination.  *Id.*; *see also* Def's Trial Ex. 3 (Email from Arline to Negron-Rivera, Nov. 14, 2016).

27. After the meeting, at 1:51 p.m., Negron-Rivera sent Arline an email informing her that Johnson had filed for a Peace Order against him, which was scheduled for a hearing on Friday, November 4.  Def's Trial Ex. 2 (Email from Arline to Negron-Rivera, Nov. 1, 2016).

28. After learning of the Peace Order, Arline met with Johnson and Brown to review Johnson's telework schedule.  Arline proposed changing Negron-Rivera's telework

schedule so that he would not be in the office on the same days as Johnson.  Johnson approved that approach.  Arline Testimony, June 22, 2022.

29. At 2:39 p.m. on November 1, 2016, Arline emailed Negron-Rivera his revised telework schedule, which she said was "the opposite days that Percilla [Johnson] will be in the office."  Def's Trial Ex. 2 (Email from Arline to Negron-Rivera, Nov. 1, 2016); *see also* Arline Testimony, June 22, 2022.

**E.  FDA Investigation and Response**

30. The FDA Office of Internal Affairs ("OIA") subsequently initiated an investigation into Negron-Rivera's conduct and Johnson's allegations against him.  Gonzalez Testimony, June 22, 2022.  On November 22, 2016, Arline emailed Negron-Rivera informing him that he was being placed on a permanent, full-time telework schedule "in light of the nature and depth of the allegations currently being investigated."  Def's Trial Ex. 4 (Email from Arline to Negron-Rivera, Nov. 22, 2016).

31. The OIA investigation detailed that two additional employees, Viviana Matta and Monet Rogers, had previously complained of Negron-Rivera's conduct.  Gonzalez Testimony, June 22, 2022.

32. Viviana Matta, then a Consumer Safety Officer in the FDA's Raleigh, North Carolina field office, became acquainted with Negron-Rivera in late 2012 when he was assigned to plan an international trip for her.  During and after the trip planning process, Matta informed her then-supervisor, Randy Baxter, that some of Negron-Rivera's comments—as well as the length of his communications with her—had made her uncomfortable.  Matta Testimony, June 21, 2022.  She also provided Baxter with copies of email exchanges between her and Negron-Rivera, in which he told Matta that he loved her and commented on her physical appearance.  Pl's Trial Ex. 4 (Translated

Spanish-language emails between Matta and Negron-Rivera).   Matta's supervisor
forwarded a copy of the email exchange to Michael Chasey, who in turn, sent them to
Roderick Brown in August, 2013.   Chasey Testimony, June 23, 2022.   In response to
her complaint, Matta's supervisor asked her if she would like to formally report
Negron-Rivera.   Matta declined, but said that she did not want to work with Negron-
Rivera anymore.   Matta was not assigned to work with Negron-Rivera thereafter.   Matta
Testimony, June 21, 2022.

33. Months later, Matta applied, and was selected, for a temporary detail assignment that
required her to spend roughly two weeks in the Rockville, Maryland office in October,
2014.   While in Rockville, Matta encountered Negron-Rivera.   After the encounter,
Matta told Michael Chasey that she had had a previous bad experience with Negron-
Rivera that made her uncomfortable, and she did not want to have direct
communication with him.   Matta did not offer—nor did Chasey inquire about— the
details of her experiences with Negron-Rivera.   Thereafter, Chasey established
channels preventing direct communication between Matta and Negron-Rivera.   Matta
and Negron-Rivera had no further contact.   *Id.*; *accord* Chasey Testimony, June 23,
2022.

34. The investigation also identified a second previous complainant, Monet Rogers.   In
May, 2016, Rogers informed Paul Perdue and her then-supervisor, Kevin Gonzalez, of
a situation that made her feel awkward and uncomfortable.   Rogers told Gonzalez and
Perdue that she went to Negron-Rivera's office because he had previously asked her to
lunch.   Rogers stated that while in his office, Negron-Rivera proposed to cook dinner
for them both in her home.   Rogers relayed that after declining the invitation and stating

that she lived with her boyfriend, Negron-Rivera responded that he and her boyfriend "could share."  In response, Perdue and Gonzalez asked Rogers how she would like them to handle the incident.  Rogers responded that she did not want to interact with Negron-Rivera moving forward.  Gonzalez agreed to talk to Negron-Rivera, and Negron-Rivera did not have further conversation with Rogers after that point.  Rogers Testimony, June 23, 2022; *see also* Def's Trial Ex. 21 (Kevin Gonzalez Statement).

35. In July, 2018, following the OIA investigation, Chasey provided written notice to Negron-Rivera that he was to be removed from federal service within 30 calendar days due to sexual misconduct ("Removal Notice").  The Removal Notice specifically charged Negron-Rivera with: (1) inappropriate and/or unwelcome touching or other physical conduct with Johnson and Matta; and (2) inappropriate and/or unwelcome teasing, jokes, actions, gestures and remarks in a sexual nature toward Johnson, Rogers, and Matta.  The Removal Notice further stated that "[y]our sexual misconduct toward Ms. Johnson was unwanted, unprofessional, and inappropriate.  These incidents have interfered with Ms. Johnson's work performance and created an [*sic*] hostile work environment for her."  The Removal Notice also stated that Negron-Rivera had interfered with Matta's and Rogers's work performance, and created a hostile work environment for them both.  Def's Trial Ex. 9 (Removal Notice, July 23, 2018).  Rather than be terminated, Negron-Rivera proposed to retire.  Chasey Testimony, June 23, 2022.  The FDA accepted Negron-Rivera's offer of retirement, and he subsequently left the Agency.  *Id.*

## II.     CREDIBILITY ANALYSIS

Before proceeding to its conclusions of law, this Court pauses to explain the credibility determinations underlying the findings of fact described above.  This Court credited almost all of the testimony of the witnesses at trial, but did not credit significant components of Johnson's trial testimony.  Simply put, while this Court does not necessarily believe Johnson had any intent to deceive, her credibility as a testimonial witness was meaningfully undermined by materially inconsistent prior statements, extreme disparities in her demeanor and comportment, and the general implausibility of some of her present testimony.

First, much of Johnson's trial testimony was in direct conflict with her prior sworn statements—namely, testimony during her Peace Order Hearing given within a month of the critical events ("Peace Order Testimony"); her initial affidavit to the FDA in February, 2017 ("FDA Affidavit"); her FDA rebuttal affidavit in March, 2017 ("Rebuttal Affidavit"); and her deposition ("Johnson Deposition").  Indeed, by this Court's count, at least six of the allegations underlying Johnson's claims were plagued by internal contradictions.  First, Johnson testified at trial that on October 13, Negron-Rivera grabbed the back of her neck to force her head towards his and squeezed her breasts in the restaurant parking lot.  That testimony is undermined by both her Peace Order Testimony and her FDA Affidavit, in which she did not allege that Negron-Rivera groped or grabbed her that day.  Johnson Testimony, June 21, 2022.  Confronted with these inconsistencies on cross examination, Johnson asserted that her prior omissions stemmed from an intense self-consciousness and aversion to talking about her breasts. This explanation is unpersuasive, however, given that she discussed her breasts in both the Peace Order Testimony and the FDA Affidavit—but did not claim that Negron-Rivera touched them.  Second, Johnson's trial testimony that she had to struggle to break free from Negron-Rivera in the restaurant parking lot on October 13 is contravened by her previous testimony that when she pushed Negron-Rivera

off, he released her.  *Id.* (confronted with Johnson Deposition).  Third, Johnson's trial assertions

that Negron-Rivera sexually assaulted her for a second time in the FDA parking lot after lunch on

October 13 cannot be reconciled with her earlier (and far more proximate) testimony that the two

returned to work from lunch that day without a second incident of physical contact.  *Id.* (confronted

with Peace Order Testimony).   Fourth, Johnson's claims at trial that upon entering Negron-

Rivera's office on October 19, he grabbed and kissed her and would not let her go, and that she

ran out of his office immediately after breaking free from him, are refuted by her prior testimony

that on October 19, she was in Negron-Rivera's office for approximately eight minutes total, only

a small fraction of which involved physical contact.  *Id.* (confronted with Johnson Deposition).

Fifth, Johnson's trial testimony that Mbodj discouraged her from filing a complaint against

Negron-Rivera during their initial conversation is wholly contradicted by Johnson's prior sworn

statement admitting that Mbodj had asked her if she wanted to file a complaint, and that she had

declined.  *Id.* (confronted with Rebuttal Affidavit).  Sixth and finally, Johnson's trial testimony

that she complained about Negron-Rivera to Mbodj on two occasions during the week of October

13—specifically, on October 18 and October 19—is also contradicted by a prior statement, albeit

an unsworn one.  In her voicemail to Arline on October 26, 2016, Johnson stated that she had

"mentioned it to [Mbodj] *once* before."  *See* Def's Trial Ex. 22 (Voicemail from Johnson to Arline,

Oct. 26, 2016) (emphasis added).

Although the above-referenced contradictions are most significant insofar as they concern

central factual disputes, Johnson's testimony on even seemingly minor issues was also mired by

inconsistencies or illogicalities. Johnson averred, for instance, that she was not friends with

Bennett-Lamb and did not socialize with Bennett-Lamb outside work, but conceded that they knew

each other before joining the FDA, discussed their personal lives, knew each other's children, and

that Bennett-Lamb had met her spouse outside work. *Id.* At another juncture, Johnson repeatedly denied knowing the English translation of the Spanish word "amiga," or "miga" until confronted with Peace Order Testimony in which she had translated the term herself. *Id.* Johnson also denied giving Negron-Rivera her personal email address despite previously testifying that she had done so (and despite uncontroverted evidence that he had the personal email address and sent her an email). *Id.*

The implications of Johnson's conflicting narrative account are further exacerbated by apparent and significant shifts in her demeanor while testifying. On direct examination, Johnson became highly and visibly upset when asked to describe her interactions with Negron-Rivera; much of her testimony was delivered through heavy sobs in a raised voice. The wrenching emotionalism presented on direct examination, however, was a marked departure from her comportment during cross examination. On cross, Johnson appeared entirely composed, at times confrontational—and certainly far from tears—even when challenged to discuss the more granular details of her allegations. Equally telling is the stark difference between Johnson's direct examination and her voicemail on October 26, 2016, roughly one week after Negron-Rivera's last physical contact with Johnson and shortly after other workplace interactions she describes. That evening, Johnson asked Arline in a casual, even-toned voice for "off the record" guidance about a situation she was "starting to feel really really uncomfortable about." Def's Trial Ex. 22 (Voicemail from Johnson to Arline, Oct. 26, 2016). This Court credits Arline's testimony that after listening to the voicemail, she did not feel the situation was urgent; by contrast, Johnson's comportment during direct examination could not be characterized as anything less than distraught. Simply put, the vicissitudes of Johnson's demeanor were extreme. Whatever it may say about her credibility, Johnson appeared far more emotional and upset on direct examination—years later—

than other witnesses and evidence suggest she was in the days and weeks after the alleged incidents.  Although emotions can certainly develop over time, this contrast cannot be ignored, particularly when assessing the Agency's response to her reports.

Critically, even were this Court to disregard the issues described above and consider Johnson's trial testimony in a vacuum, it would still find her version of events implausible. According to Johnson's trial testimony, Negron-Rivera forcibly attacked her twice on October 13, 2016 in the following manner:   First, after arriving at the restaurant, Negron-Rivera grabbed Johnson by the neck, kissed her, and squeezed her breasts as she resisted and furiously screamed in protest; Johnson was so repulsed that after breaking free, she repeatedly spat and washed out her mouth.  *Id.*  Second, on the car ride back from lunch, Negron-Rivera propositioned Johnson in a menacing manner that made her fear he would not drive her back to work; after parking, Negron-Rivera forcibly kissed and groped her despite her frenzied cries for him to stop, which she echoed on the stand.  *Id.*  This depiction of events, however, is dubious for several reasons.  As an initial matter, this Court doubts that Johnson would proceed into the restaurant to have a business lunch with Negron-Rivera, and then willingly reenter his car to travel the short distance back to their office, after suffering such a violent and grotesque attack.   Next, Johnson's trial testimony is difficult to reconcile with her decision to wait until the following week, when she had a standing appointment with Mbodj, to raise the issue.[3]   Finally, Johnson's portrayal becomes wholly implausible in light of the fact that just days later, on October 18, she voluntarily asked Negron-Rivera for a personal favor—to set aside paper calendars for her—and apparently felt comfortable

---

[3] Johnson testified that she unsuccessfully tried to contact Mbodj between October 13 and October 18, but did not adduce evidence in the form of any voicemails, texts, emails, or call records to corroborate that assertion.  And, as described above, Johnson did text and leave a voicemail a week later, when attempting to lodge a complaint with Arline on October 26 and 27.

stopping by his office alone to retrieve them.  *Id.*; *see also* Def's Trial Ex. 5 (Emails between Johnson and Negron-Rivera, Oct. 18, 2016).  Johnson's trial testimony regarding a third sexual assault on October 19, 2016 also fails to withstand scrutiny.  At trial, Johnson testified that upon arriving in Negron-Rivera's office on October 19 to collect her calendars, Negron-Rivera closed the door, grabbed, hugged, manhandled, and kissed her even though she repeatedly begged and cried for him to stop; upon breaking free, she fled his office immediately.  *Id.*  However, this Court finds it highly unlikely that Johnson could have screamed and yelled in the office on October 19 in a manner even remotely similar to her cries on the stand without attracting the attention or assistance of anyone.  Johnson also testified that on October 26, Negron-Rivera offensively stared at her during a staff meeting; later Johnson dropped by Bennett-Lamb's office to deliver cookies, found Negron-Rivera there, and sat down before realizing that he was staring at her "as if he was trying to see through [her] clothes."  *Id.*  However, if prior events had unfolded as Johnson averred, her testimony that she sat down with Negron-Rivera in Bennett-Lamb's office for an apparently social visit on October 26 is completely incomprehensible.  This Court recognizes that individuals respond to traumatic events in varied and sometimes confounding ways.  It does not seek to prejudge survivors' "appropriate" reactions, or to suggest that any of these issues, standing alone, would be a sufficient reason to discount a witness's testimony.  In totality, however, the fissures in Johnson's narrative compound upon each other to create a series of events that strain credulity past its breaking point.

To be clear, this Court did not conclude that Johnson is necessarily insincere.  This Court recognizes that by the time this case proceeded to trial, Johnson was charged with the daunting task of recounting in detail events that had transpired nearly six years prior, which were then contrasted against accounts that she had provided years before.  Recollections change over time

and can be affected by other intervening events.  Johnson may well believe the version of events she described on the stand.  However, by any metric, Johnson has failed to advance a consistent and coherent narrative while under oath, and the facts elicited at trial do not support the narrative to which she testified.  This Court cannot fully credit such demonstrably inconsistent testimony, particularly where the witness herself conceded her poor memory.  *See* Johnson Testimony, June 23, 2022.  This Court accordingly declines to credit Johnson's trial testimony over the other witness testimony and documentary evidence, particularly insofar as Johnson's account is contradicted by her own earlier statements.[4]

## III.   CONCLUSIONS OF LAW

The parties agree on the applicable legal framework governing Johnson's claims.[5]   To establish a hostile work environment based on sexual harassment, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . [sex]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer."  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)); *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013).   The parties solely

---

[4]Although Negron-Rivera's former testimony at the Peace Order hearing was admitted into evidence, *see* Fed. R. Evid. 804, this Court did not need to make an assessment of his credibility as a testimonial witness, nor did his testimony bear on this Court's assessment of Johnson's credibility.  To the contrary, this Court's findings of fact and corresponding conclusions of law turned only on Johnson's lack of credibility and resulting failure to meet her burden of proof.

[5] Johnson's Complaint states claims for both sexual harassment (Count I) and hostile work environment (Count II) under Title VII.  ECF 27.  However, as this Court noted during trial, neither the parties nor the Court in its earlier Memorandum Opinion, ECF 30, differentiated between the claims, instead treating both as functionally a hostile work environment claim perpetrated through sexual harassment.  At closing arguments, the parties agreed that the analysis governing both claims was identical.

dispute whether Johnson has satisfied her burden with regards to the latter two elements. This Court answers both questions in the negative.

### A. Severe or Pervasive

The "severe or pervasive" standard "requires an objectively hostile or abusive environment—one that a reasonable person would find hostile or abusive—as well as the victim's subjective perception that the environment is abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003); *Evans v. International Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) (plaintiff must provide evidence sufficient to show that she "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." (quoting *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009))). In determining whether an environment is objectively hostile, courts must consider all circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 23). This standard is intended to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) ("[Title VII] requires neither asexuality nor androgyny in the workplace . . . We have always regarded th[e] [objective] requirement as crucial . . . to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory 'conditions of employment.'").

The evidence elicited at trial fails to demonstrate that Negron-Rivera's unwelcome conduct towards Johnson was so severe or pervasive as to effectuate discriminatory changes in the

conditions of her employment.  As an initial matter, this Court considers at least two of the incidents described at trial—namely, Negron-Rivera's staring during a staff meeting, and his presence in Bennett-Lamb's office on October 26—to fall squarely within the category of ordinary workplace tribulations that this standard was designed to exclude.[6]  *See Faragher*, 524 U.S. at 788. What remains, then, are two instances in which Negron-Rivera kissed, or attempted to kiss, Johnson.  Although these occurrences were undoubtedly inappropriate and offensive, they do not satisfy the law's demanding standard when considered in the "constellation of surrounding circumstances, expectations, and relationships" evidenced at trial.  *Oncale*, 523 U.S. at 82.

While this Court does not doubt that even a single nonconsensual kiss can constitute severe conduct, the circumstances surrounding the incidents on October 13 and October 19 undermine Johnson's arguments as to their severity or pervasiveness.  Evidence adduced at trial did not indicate that Johnson made any appreciable effort to distance herself from Negron-Rivera in the moments and days following the incidents.  After Negron-Rivera kissed or attempted to kiss Johnson on October 13, she proceeded to have lunch with him, and allowed him to drive her back to the office.  At some point thereafter, Johnson gave Negron-Rivera her personal email address. Likewise, mere days after the initial incident, Johnson asked Negron-Rivera for an unsolicited favor—to set aside calendars for her—and arranged to pick them up in person in his office.  *See* Johnson Testimony, June 21, 2022.  Indeed, although Johnson's conduct towards Negron-Rivera is consistent with that of a person who has rebuffed an unwanted romantic proposition, it did not

---

[6] This Court does not suggest that a harasser's lingering or inappropriate stares cannot, in some contexts, create or contribute to severe or pervasive conduct when considered in conjunction with other offensive behavior.  Given Johnson's general credibility issues, as well as this Court's determinations regarding the severity of her other encounters with Negron-Rivera, this Court does not find her subjective interpretation of his staring to be credible or significant.  It is uncontroverted that Negron-Rivera did not speak to or touch Johnson on October 26.

suggest that she was afraid of or felt threatened by him after October 13.  For instance, after Negron-Rivera kissed Johnson on October 19, she merely asked that they keep their relationship professional.  *See* Pl's Trial Ex. 1 (Emails between Johnson and Negron-Rivera, Oct. 19, 2016) ("I will appreciate that we remain co-worker [*sic*] and nothing else.").  Johnson's calm, nonplussed recounting of the incident to Mbodj during the week of October 16, her initial declination to file a complaint against Negron-Rivera, and her equally measured demeanor in the recorded voicemail message to Arline similarly weigh against a finding of severity.  Mbodj Testimony, June 23, 2022 (describing Johnson's demeanor when discussing Negron-Rivera during the week of October 16).

Importantly, Johnson also failed to show that Negron-Rivera's conduct altered the conditions of her employment or otherwise interfered with her work performance.  *Boyer-Liberto*, 786 F.3d at 277.  Johnson concedes that she demonstrably thrived at work during and subsequent to her interactions with Negron-Rivera, and that she received a promotion and a larger office less than a year after those encounters.  Johnson Testimony, June 21, 2022.  Nonetheless, Johnson argues that her conditions of employment were altered because she: (1) felt preoccupied and unproductive; (2) was afraid to come to work; and (3) took six-weeks leave from November, 2016 until January, 2017.  Considered holistically in light of the evidenced adduced at trial, these arguments fail.  First, Title VII does not ward against feelings of preoccupation or the annoyance of having to complete tasks multiple times.  Although these are certainly unpleasant phenomena, they are more accurately characterized as unfortunate, occasional realities of professional life, not a significant performance issue or an alteration to a condition of employment.  *Contra Strothers v. City of Laurel, Md.*, 895 F.3d 317, 332 (4th Cir. 2018) (plaintiff's conditions of employment were potentially changed where her start times were altered, she was subjected to unfair evaluation, and forced to adhere to arbitrary dress code that applied to her alone).  Second, despite Johnson's

averred trepidation to come to the office, no evidence was adduced to show any change in Johnson's work schedule during the relevant period or any demonstrable effort to avoid physical contact or communication with Negron-Rivera.  *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) ("[B]ruised or wounded feelings will not . . . satisfy the severe or pervasive standard.  Some rolling with the punches is a fact of workplace life.").  Third, Johnson's uncorroborated testimony regarding her period of leave does not, itself, carry her burden.  Johnson provided no documentary evidence or other supporting witnesses to establish that this leave occurred, or that it was motivated by Negron-Rivera's conduct rather than, for instance, the holiday season or the federal government's use-it-or-lose it leave system.[7]

Against this backdrop, Johnson's testimony that she was so traumatized by Negron-Rivera that she experienced hair and weight loss and was forced to begin therapy, cannot solely carry her burden.  *See* Johnson Testimony, June 21, 2022.  This Court acknowledges that Negron-Rivera's conduct—coming as it did during an intensely tumultuous period, which was punctuated by several deeply traumatizing life events—plausibly affected Johnson's mental health and could well have been "the straw that broke the camel's back" in terms of her ability to cope.  *See id.*  But her testimony regarding what she perceived to be effects of Negron-Rivera's behavior does not establish objective severity, particularly in the context of her contemporaneous responses to her encounters with him, and the multiple personal tragedies she experienced around that same period.

---

[7] Notably, the Removal Notice states that since Negron-Rivera's encounters with Johnson, "she has been on telework to avoid interaction with you."  Def's Trial Ex. 9 at 4.  (Removal Notice, July 23, 2018).  As described above, however, Arline specifically adjusted Negron-Rivera's telework schedule such that Johnson could continue her established telework schedule without interacting with Negron-Rivera.  *See* Def's Trial Ex. 2 (Email from Arline to Negron-Rivera, Nov. 1, 2016); *see also* Arline Testimony, June 22, 2022.  The Removal Notice did not indicate that Johnson had taken any leave due to her encounters with Negron-Rivera.

Finally, Johnson relies on the FDA's Removal Notice to argue that the severity or pervasiveness of Negron-Rivera's conduct is a foregone conclusion.  It is true that the document, which notified Negron-Rivera of the Agency's intention to terminate him, stated that "[t]hese incidents have interfered with Ms. Johnson's work performance and created an [*sic*] hostile work environment for her."  Def's Trial Ex. 9 at 4 (Removal Notice, July 23, 2018).  Despite this language, the FDA Removal Notice cannot bear the weight that Johnson places on it.  As an initial matter, there is no indication that the letter intended or purported to contain legal conclusions regarding the cognizability of a Title VII claim against the Agency.[8]  Even had it done so, the phrase "hostile work environment" are not magic words, the mere invocation of which makes it so.  Federal courts are not required to accept formulaic legal conclusions as true even at the pleading stage, and certainly need not do so when determining liability.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Johnson provided no authority for the argument that the FDA somehow conceded her Title VII claim merely because it utilized a phrase that is within the common parlance, and this Court declines to afford some quasi *res judicata* effect to a letter sent to a third-party.

In sum, Negron-Rivera's conduct toward Johnson was inappropriate, unprofessional, and offensive.  This Court does not doubt that Negron-Rivera's behavior had a deleterious effect on Johnson and engendered complex feelings compounded by other troubles in her personal life.  However, in light of the totality of the circumstances surrounding Negron-Rivera's conduct—

---

[8] Tellingly, the Removal Notice also states that Negron-Rivera created a hostile work environment for Matta and Rogers, the latter of whom endured a single, inappropriate conversation with Negron-Rivera.  Unprofessional as Negron-Rivera's comment to Rogers was, this Court is aware of no precedent suggesting that an isolated, non-threatening sexual statement to a coworker constitutes severe or pervasive conduct under Title VII.  Moreover, the FDA Removal Notice does not cite or discuss Title VII caselaw or applicable legal standards.

including its frequency and severity, Johnson's contemporaneous responses, and her continuously satisfactory job performance—this Court concludes that Johnson did not clear the "high bar" required to satisfy the severe or pervasive test. *Sunbelt Rentals*, 521 F.3d at 315.

### B. Imputable to Employer

Were this Court to conclude that Johnson satisfied the demanding standards for severe or pervasive conduct, she would still need to establish a factual basis to impute Negron-Rivera's behavior to her employer. Johnson has not carried her burden of doing so.

Where, as here, the offending individual is a coworker rather than a supervisor, "the employee must show that the employer was 'negligent in controlling working conditions'—that is, the employer 'knew or should have known about the harassment and failed to take effective action to stop it.'" *Strothers*, 895 F.3d at 332 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)); *see also Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 423 (4th Cir. 2014) (harassment by a coworker can be imputed to an employer only "if the employer knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end the harassment.'" (quoting *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995))). Although an employer's response to allegations of harassment must be prompt and adequate, it need not be flawless. *See Spicer v. Com. of Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995) ("we have never suggested that an employer must make the most effective response possible and we have consistently held that an employer is only liable for sexual harassment committed by its employees if no adequate remedial action is taken."). Rather, so long as the "employer takes remedial measures that are reasonably calculated to end the harassment, liability may not be imputed to the employer as a matter of law." *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 675 (4th Cir. 2011).

Johnson insists that the FDA had actual notice of Negron-Rivera's harassment on October 18 or October 19, the date that she first raised concerns about him to Mbodj.  This argument fails because Johnson did not convey sufficient information during that initial conversation to put the FDA on notice of potential sexual harassment.  Instead, Johnson merely told Mbodj that Negron-Rivera tried to kiss her after their heads bumped while buckling their seat belts on their way to a one-on-one lunch, and that she was not interested in filing a complaint.  Mbodj Testimony, June 23, 2022.  Information suggesting that an employee had made a failed romantic overture to a coworker who was uninterested in pursuing a complaint is, in this Court's view, insufficient to put the FDA on notice of the type of behavior Johnson now alleges.  For her part, Johnson argues that although she told Mbodj "what had happened to [her]," she was too embarrassed to go into "full detail," and therefore did not disclose that Negron-Rivera had grabbed her neck and groped her breasts.  Johnson Testimony, June 21, 2022.  For purposes of an imputability analysis, however, Johnson's explanation for the vast gulf between her trial testimony and the account she contemporaneously provided to Mbodj is wholly immaterial.  What matters is when the FDA knew or should have known of Negron-Rivera's sexual harassment, which, plainly, is not the point at which Johnson first approached Mbodj and told what she now says is a highly sanitized version of events.  *See Wilson v. Gaston Cnty.*, 685 F. App'x 193, 199 (4th Cir. 2017).

Johnson also argues that Rogers's and Matta's prior complaints against Negron-Rivera to their respective supervisors should have put the Agency on notice of harassment.  Matta, another FDA employee, had complained to her supervisor about Negron-Rivera in 2013, and again to a different supervisor in 2014 after encountering him in person in the Rockville, Maryland office.  In both instances, Matta only asked not to interact with Negron-Rivera in the future, and—in both instances—her supervisors agreed.  Matta Testimony, June 21, 2022; *see also* Chasey Testimony,

June 23, 2022.  Similarly, Rogers raised concerns about Negron-Rivera to her supervisor in May, 2016.  Rogers asked not to work with or near Negron-Rivera moving forward, and her supervisor agreed to intercede on her behalf.  Rogers confirmed that after the initial incident, there were no further issues.  Rogers Testimony, June 21, 2022.  As to both Matta and Rogers, the FDA took action upon its employees' requests to prevent an unwelcome recurrence and in both cases, its intervention halted the offending conduct.  *Xerxes*, 639 F.3d at 670 ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law . . ." (quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 411-12 n.8 (3d Cir. 1997)).  The two prior complaints leveled against Negron-Rivera during the course of his decade-long tenure at the FDA did not militate his dismissal, or suggest that he was generally unfit to coexist in a workplace with women.  *Xerxes*, 639 F.3d at 674 (Title VII does not require an employer "to discharge every alleged harasser." (quoting *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir. 1997)).  Moreover, neither Rogers's or Matta's complaints put the FDA on notice that Negron-Rivera presented a physical threat to his coworkers.  Indeed, prior to the events described herein, Johnson herself worked with Negron-Rivera for roughly six years without incident.

In sum, then, the FDA was not put on notice of Johnson's sexual harassment allegations until October 27, 2016, when Johnson told Mbodj and Arline unequivocally that Negron-Rivera was sexually harassing her.  It is undisputed that, upon receiving such notice, the FDA took action on the very same day.  *See* Def's Trial Ex. 1 (Text messages between Johnson and Arline, Oct. 27, 2016); Arline Testimony, June 22, 2022; *see also* Def's Trial Ex. 11 (Email from Arline to Mbodj, Oct. 27, 2016).  By the end of the day on Thursday, October 27, the FDA had provided Johnson with informational materials on preventing sexual harassment in the workplace, contacted its employee labor relations liaison, and developed a response plan in coordination with the liaison.

*See* Pl's Trial Ex. 2 (Preventing Harassment Pamphlet); *see also* Arline Testimony, June 22, 2022. By Tuesday, November 1, roughly three business days after Johnson's complaint, Negron-Rivera had been informed of the allegations against him and directed to cease any contact with her. *See* Def's Trial Ex. 2 (Email from Arline to Negron-Rivera, Nov. 1, 2016). Critically, although the parties dispute whether the last offending incident occurred on October 19 or October 26, they all agree that by October 27—the date the FDA received effective notice—Negron-Rivera's harassment had ceased.

Johnson levels a bevy of attacks against the FDA's response to her allegations, none of which is cognizable under the law. *See* Johnson Closing Argument, June 24, 2022 (arguing that the FDA should have met with Negron-Rivera on October 27, separated the two on October 27, more quickly provided Johnson with sexual harassment materials, and immediately placed Negron-Rivera on permanent telework). The law does not require that employers immediately react to every allegation of harassment by imposing discipline without regards to fair process or best practices, nor is an employer required to keep a complainant apprised of every responsive action it takes on her behalf. *Xerxes*, 639 F.3d at 674-75 ("Plaintiffs often feel that their employer 'could have done more to remedy the adverse effects of the employee's conduct. But Title VII requires only that the employer take steps reasonably likely to stop the harassment.' The standard 'in no way requires an employer to dispense with fair procedures for those accused or to discharge every alleged harasser.'" (quoting *Knabe*, 114 F.3d at 414; *L & L Wings*, 132 F.3d at 984) (internal citations omitted)). Johnson may understandably wish that the FDA had immediately told Negron-Rivera to cease contact with her. Instead, it delivered that directive days later, in-person, in the company of Negron-Rivera's union representative, after coordinating with employee labor relations. Its decision in this regard was both reasonable and adequate. *Id.* at 675 ("[Defendant]

bore responsibility to investigate its employees' complaints of [ ] harassment by their coworkers *and* an obligation to fairly investigate and only discipline offending coworkers.") (emphasis in original).  This is particularly the case where, as here, there is no allegation that Negron-Rivera continued his harassment in the days-long period between Johnson's complaint and the Agency's instruction to cease contact with her.

In sum, when Johnson told the FDA that she was being harassed by a coworker, it promptly took effective and proportional action to stop it.  *See Strothers*, 895 F.3d at 332.  Accordingly, even were Negron-Rivera's conduct severe or pervasive, it could not be imputed to the Agency.

## IV.   CONCLUSION

For the foregoing reasons, this Court finds that Plaintiff has failed to meet her burden to prove that the FDA is liable under Title VII for a hostile work environment based on sexual harassment.  Therefore, judgment will be entered in favor of Defendant and against Johnson.  A separate order follows.


Dated: July 7, 2022                                      _____/s/_____
                                                          Stephanie A. Gallagher
                                                          United States District Judge